Nathan D. Lapham, Off. Ref.
This is an action in equity brought to impress a trust upon certain real property, consisting of a house and lot, and to compel the defendant to convey the same to the plaintiff; also, for an accounting for all moneys, rents and income received by the defendant while in possession of the property. The defendant joined issue upon the facts alleged in the complaint and set up a counterclaim based upon an alleged default in payment of moneys due under an order of the Livingston County Children’s Court directing plaintiff to pay the weekly sum of $10 toward the support of defendant and her family, such arrears amounting to the sum of $670.
Upon stipulation of counsel an order was granted by the Supreme Court at Special Term, referring the action to me as Official Referee to try and determine.
The parties to this action are husband and wife, having been united in marriage on the 12th of July, 1926. In the course of time four children were born and since the purchase of the premises which are the subject of this litigation, they have resided with the mother.
In 1937 Mr. Alonzo procured employment with the American Zinc and Chemical Company at Langeloth, Pennsylvania, and moved his family there. Owing to the climate and unfavorable surroundings in which to live and rear a family, it was mutually decided that a change should be made and Mrs. Alonzo was delegated to return to New York State in search of a desirable home, while he continued on the job. She made her headquarters at the home of her mother in Egypt, New York, while looking for a house. Eventually she discovered the property in question and reported to her husband that a small house and lot was available in the town of Livonia, Livingston County, for a consideration of $800. Mr. Alonzo instructed her to make the purchase if a down payment of $200 was acceptable, with the balance secured by a purchase-money mortgage. These terms being satisfactory, the plaintiff forwarded to the defendant the initial payment and the deal was closed, the title being *263 taken in the name of Mrs. Alonzo on the 19th day of August, 1939, and the mortgage given by her.
The plaintiff claims that he wished to remain in Pennsylvania and come back with the furniture, so it was agreed that Mrs. Alonzo conclude the transaction. After the preliminary talks, the agreements for this purchase were made by correspondence in which the plaintiff directed his wife to arrange with a Mr. Beecher for the loan, and enclosed to her a note addressed to Beecher to the effect that ‘ ‘ if you loan this money to me, you can have the mortgage of the property and give me two years to pay for it. I will pay you the interest of this money and will be your friend as long as I live.” He testified that, after they had secured the loan and he had forwarded the initial payment to his wife, “ She wrote back to me and she says, this property is in my name because as long as you are not here you can’t very well sign your name to it but when you come home you can have this property in your name.” She denies that there was any mention of title in her letters because it had been decided in Pennsylvania that she should attend to the business.
It so happened that a temporary lay-off permitted him to visit the new home the day they moved in and upon this occasion he paid $50 for furniture of the former owner still in the house. While the defendant later produced a receipt therefor made out in her name, he testified that he furnished the money, personally made the payment in the presence of witnesses named by him, and paid no attention to the manner in which the receipt was made out. Mrs. Alonzo had carried on the property transaction, and this husband and wife were both present and acting in concert on this furniture purchase, so that I do not think the mere fact that the receipt happened to be made out in her name and handed to her in any way contradicts him. It was on this occasion that he says he inquired of his wife the name of the lawyer who drew the papers and she told him John Bishop. He testified that in answer to his question: “ Well, have you got everything set? ” She said “ Yes,” but she said, “ your name is not in it as I told you in the letter.” I says, “ Well, we can go down and have it on.” She said “We can only see Mr. Bishop once a week unless you go to Geneseo.” I says, “Well, we don’t have no car, and let’s cut the expense, we will wait sometime, some day.” “I let it ride. I trusted her.” At no point in her testimony does the defendant specifically deny this conversation.
Mr. Alonzo remained with the family approximately two and one-half months before being recalled to work in December. Upon the receipt of the notice to return to the plant, he testified *264 he told his wife “ here we are going to have a break, I am going to pay for the place, I earn good money there. * * * I am sure I am going to pay for it in a very short time. As soon as I pay for it I am coming home to stay.”
The record reveals that the mortgage was discharged April 18, 1941, four months short of the period in which he agreed to liquidate the same. It is his further claim that from the date of the purchase to his return in April of 1943 he had forwarded or given to his wife the sum of $8,094 by check, cash or money order. He claims that the receipts for the major portion of of the money orders were included in the packet of letters destroyed by her but ho accounts for $2,399.50 sent by money order through the post office at Langeloth from September, 1939, to April, 1943, inclusive. He also testified that he sent money orders from the post offices at several other places although no record as to them was submitted, and that he had receipts in his room at Livonia for the last $700 or $800 sent home, but these were not produced and may have been a part of the amount sent from Langeloth. He said that on many occasions, when he received word that his wife was short of funds and his work did not permit him to get to the post office immediately, he inclosed 5,10, 15 or 20 dollars in a letter. His wife claims that the times he sent money in letters were rare, and then not in the amounts claimed by him. The daughter’s testimony tends in a way to support defendant on this point, although it lacks strength and force because of her limited opportunity to know with exactness. The answer admitted and the defendant’s counsel conceded that she had received approximately $2,000 from him during this period. Although the defendant said she twice paid the interest by working for the holder of the mortgage, there is no dispute that the plaintiff furnished the money with which the house was purchased and the major portion of the interest paid. Mrs. Alonzo testified quite at length as to the earnings of herself and children during the period here involved. This, I feel, was in fulfillment of the arrangement entered into at the time of the purchase in which, as she testified, he was to pay for the place as soon as he could and then come home and she was to work and support the children as much as she could.
He did pay for the home and she worked and devoted her earnings to the family support but, following the discharge of the mortgage in 1941, Mr. Alonzo did not return home. This is understandable in view of the substantial income from his job. Instead, he made improvements to the property, continued to send money home to cover these obligations and, according *265 to him, toward the ordinary running expenses of the family, and he visited this family- three or four times a year. This went on until April, 1943, when he decided to return to Livonia Center. A few days before he left Langeloth, he mailed a box containing groceries, hose, letters from his wife and he claims the major portion of the receipts for the money he had sent Mrs. Alonzo since September, 1939. He said he addressed this package to his wife in the thought that it might arrive before he did. Almost immediately upon his return he was greeted with a warrant and thrown into jail because of his alleged failure to support the family. He then forbade the postmistress to deliver the package to his wife, and delivery was refused to the children but, when Mrs. Alonzo, accompanied by the under-sheriff, made demand therefor, it was surrendered. She testified that she, the undersheriff and the children looked over the package of letters and she then destroyed them ‘ ‘ to get them out of the way, I had so many other things * * * it was
letters I had written to him and wasn’t anything of interest.” So impressed was the court by her confessed conduct on this occasion that I endeavored to learn from her the real motive but no reasonable or satisfactory answer was given. The plaintiff claims that her letters showed their understanding that the title was to be eventually in him and that receipts were included in the packet which revealed the amounts forwarded by him to her during this period. She testified there was no mention of title in her letters and the strongest she went as to receipts was “ No, there wasn’t anything as far as receipts are concerned, I don’t think there was any receipts in those; if there was they would have been saved. ” It is interesting to note that she did not call the undersheriff who was present when this packet was examined. She said “ I didn’t do it to be mean, anything like that, just destroyed them to get them out of the way.” I recognize that at that particular time the tension which had formed the basis of Mr. Alonzo’s imprisonment was high and the defendant may have acted impulsively without carefully weighing the wisdom or import of her act, but the speed with which she destroyed this package in the face of his known prohibition that they be delivered to her, and at the very time her husband was in jail as a result of her charge of nonsupport, certainly was unsporting to say the least, and gives rise to an inference that will not down that this packet contained statements or data which she feared. The purchase of this little home was an important event in this family, and it is unreasonable to suppose that there was not considerable written both ways concerning this venture. Furthermore, after listen *266 ing to, and observing Mr. Alonzo on the stand, it does not seem plausible to me that he would have, kept the letters for purely sentimental reasons and his concern over the package, as evidenced by his instructions to hold given the postmistress, must have been based on something more substantial and vital than coffee, sugar and a few hose. The fact that Mrs. Alonzo deprived her husband of any assistance in substantiating his claims that the packet may have contained, while she has his letters as a weapon against-him, certainly militates against her good faith.
Before proceeding further in our analysis of the facts, let us determine the law which governs in this action. The sole question before us is whether the title as it appears on the face of the transfer is absolute in the wife, or whether at the time of purchase there was a mutual and definite understanding between the parties that, owing to the difficulties arising from his absence at the time and place of execution, the title should be taken in her name to be held by her under a constructive trust for the benefit of the husband until he found it convenient to take over the title.
Chief Judge Cardozo, writing for a unanimous court in Foreman v. Foreman (251 N. Y. 237, 240), said: “ The rule is now settled by repeated judgments of this court that the statute does not obstruct the recognition of a constructive trust affecting an interest in land where a confidential relation would be abused if there were repudiation, without redress, of a trust orally declared. * * * By long acquiescence, the exception, if such it be, has wrought itself by construction into the body of the statute as if written there from the beginning. ‘ It is not the promise only, nor the breach only, but unjust enrichment under cover of the relation of confidence, which puts the court in motion.’ ”
The oral declaration is usually supported, not only through payment for the land and improvements of the same but by collection of rents and the application of the same to the use of the one who paid the purchase price. In other words, a confirmation “ by part performance, with the result that conduct as well as words had become the signs of its creation ” (p. 241).
“ Enough and ample there is here to put the case for the plaintiff in the field uncovered by the statute. His equity does not grow out of payment and nothing more. It is reinforced by words of promise, by the relation of man and wife, and by unequivocal acts of confirmation and performance. In such circumstances, the plastic remedies of the chancery are moulded to the needs of justice.” (P. 242.) (See, also, Hifler v. Calmac *267 Oil & Gas Corp., 10 N. Y. S. 2d 531, 540, affd. on opinion below 258 App. Div. 78.)
While in the instant case the rent was collected by Mrs. Alonzo, this fact is not so determinative in its nature as it would be had the husband been residing in the home with her. Moreover, at the time he was forwarding money from his earnings for payment of obligations and toward support of the family, so, from a practical standpoint, it was but natural that the money from rent become a part of this family fund. Here again, he was intrusting to her the care and management of the home during his absence. He testified that she told him she was receiving the rent and there is no evidence that he asked that the money be turned over to him or made any objection to her retaining and using it. It does appear, however, to my satisfaction that he made repairs and improvements upon the home including roofs, installation of a furnace, electric lights and a refrigerator, and either paid for, or sent money allocated to payment of these bills, thus exercising that “ dominion that goes with ownership ” (Foreman v. Foreman, 251 N. Y. 237, 240, supra), an important factor to be considered in determining where the truth lies. No longer does the common law obtain that a trust inevitably results where the consideration was paid by one while the grant runs to another, solely as the result of such payment and irrespective of intention. (Real Property Law, § 94; Fraw Realty Co. v. Natanson, 261 N. Y. 396, 401; Foreman v. Foreman, supra; Matter of Wechsler, 171 Misc. 738, 742; Gimenez v. Bonvicino, 16 N. Y. S. 2d 152.)
I encounter no difficulty in determining that the domestic relation existing between this husband and wife was a normal one, that is, they were living together with their four children; that there was a mutual desire to improve the conditions under which the children should be reared, and the family status generally; with this in mind, the arrangement heretofore outlined was entered into and the domestic relation continued through his periodic visits to the new home until some entering wedge, of which there is no direct proof before me, developed a state of infelicity which widened with the passing of time, and the result is one which reflects no credit upon either party to this action. The vile and despicable letters written by the husband to his wife introduced before me reveal a complete lack of respect and affection, and portray a sordid, selfish, undisciplined and unreasonable mind. It is obvious that he could expect little or no co-operation or love from a spouse upon whom he was pouring the vitriolic effusion of his warped mind. Even in his letter to *268 his daughter, his sole topic was money, with no alleviating expression of paternal concern or affection, and one could not but be impressed by the clean, wholesome, modest and attractive appearance of these teen-age daughters who appeared before me on the witness stand. A comparison of the training and development of these girls which, in the main, has been under the guidance of the mother, with the tone of the father’s letter to his daughter Barbara, is significant in gauging the personalities of this husband and wife in' our search for the correct version of the transaction at bar.
The claims of the litigants are diametrically opposed at some points and the testimony of each is at times ambiguous, shifting and bears the stamp of being shaped, perhaps unconsciously, to meet the present contentions. This couple have been married 17 years and the wife says that there have been differences and dissensions from the beginning. The husband testified that the family relation was amicable until the Spring of 1943, but judging from his letters to his wife, I am satisfied that his idea of family harmony is of a very low order. The family discontent has now flared into open rebellion and each litigant believes himself or herself aggrieved and abused. The result is that points of difference are magnified in importance and many acts misinterpreted. When the family were living under the same roof, Mrs. Alonzo says he kept complete control of his earnings, she did not see the checks, did not know how much he was making except as she might find a pay envelope in clothes she was laundering, and that he paid all the household bills. This he did not deny, and, while the practice had to be somewhat relaxed when Ms wife and children came to New York State, both agree that he continued to earmark the funds sent. Of course, he claims that he merely designated certain amounts to be applied on specified obligations, and the balance was left to her supervision in meeting the ordinary family needs. Mr. Alonzo is to be commended for his promptness in paying trade bills and in freeing his home from debt, and his wife by her co-operation seems to have been equally anxious to discharge their obligations. It is over the balance that the real battle wages. The plaintiff claims that during the period from September 1, 1939, to April 24, 1943, he was earning from $250 to $300 a month, or, as he testified at another point, from $65 to $100 per week; that his mother furnished him with board and lodging so that he had but minor personal expenses; and that he sent home at least $50 every two weeks and at times up to $250, with cash by letter between times in answer to emergency appeals; that in this period he turned over to his wife a total of $8,094, *269 “ everything I could get she got yet his wife was continually pressing him for more money and every time he came home he found debts from store to store from Livonia to Livonia Center that his wife had accumulated in his absence and not paid with the money he was sending her, and which he then paid; that at Christmas time in 1942 he found bills of $600 awaiting him, but when this was analyzed it developed that $375 of this amount was for a doctor bill incurred for his daughter who was taken ill while he was home, and the balance for lumber and furnace installation, none of which could be charged to his wife’s mismanagement. He showed that he had sent $2,399.50 from Langeloth and, since he was working and living there, it is but reasonable to infer that the major portion of the money orders would be procured through that post office. "While he claims he used the post offices of several other towns, there is no proof as to the amounts. He claims these receipts were all included in the packet destroyed by his wife, except some of the last ones representing payments of about $700 or $800 which he retained but did not produce. Mrs. Alonzo testified that she kept a record of the amounts turned over to her by her husband and that they totaled approximately $2,000, and were accompanied by instructions as to the use to which the money should be put, and that there was no arrangement between them for her husband to send her money for ordinary living expenses of the family; that she and the children have worked and supported themselves; that she had tilled the garden; and “ we have been happy working together.” In view of the amount of money here involved, a variance of $6,000 between the version of this husband and wife is so large as to point to a willful attempt to deceive on the part of one or the other. While I do not believe the defendant’s approximation of $2,000 gives full credit to the plaintiff, I am far from convinced by the testimony of Mr. Alonzo on this subject. It is incredible to me that a man who in their years together had been the financial dictator of the family, and who, when he and his family were living in different States, was so meticulous in the allocation of his funds should pour out all his hard-earned wages to his wife whom he knew to be working and earning at the same time that she was receiving, according to his version, such ample and frequent allotments from him. He would have us believe that all they had to show for these years of toil was a little home purchased for $800, assessed for about $1,000, with the improvements of roofs, chimney, electric lights, furnace and appliances which he had added, and that the balance of his claimed $8,094, together with the rent money and the considerable earnings of his wife *270 and children had been used up in a period of a little over three years in ordinary family and household expenses. If this were true, it would seem he had reason to believe that his wife was managing their funds in a lavish manner out of all proportion to their modest home. Yet, while he now says he would like to know what she did with the money, he testified that he never said she was extravagant, and there is no evidence that on his trips home he found she had been spending money in ways he disapproved.
On the witness stand Mr. Alonzo showed himself to be temperamental, unyielding, clever; his letters to his wife teem with invective and vile abuse, and yet he told us that, in answer to her ever-recurring demands for money, he always complied with her requests. This strains credulity to the breaking point.
Mr. Alonzo was born in Spain and did not obtain citizenship here until 1943, but until his foreign birth was revealed by a census, he told his wife that he was born in Clarksburgh, West Virginia, and she says had used this as his birthplace on various papers. Now this evidence of citizenship is not decisive on the one question of title before me, but it is illuminating in showing how he moulds facts to suit his convenience.
As I see it, the evidence as to the total amount forwarded, and as to citizenship, is competent in this action only insofar as it may shed light upon the credibility of the versions of the litigants, and I bring myself back to the question of what was the arrangement entered into when the family was a united one, and the confidential relation existed so vital in bringing the instant case within the exception universally recognized by the courts. We are, therefore, confronted with the question: Has the plaintiff satisfied this court by a fair preponderance of the credible evidence that the version of the agreement advanced by him is the correct one ? In other words, was there a mutual understanding from the beginning that the title rested in him, his wife, for convenience, taking title temporarily under a constructive trust for his benefit? The burden is on the plaintiff to show this before the court has the right to disturb the deed.
If the title had been taken in the name of the plaintiff upon the small down payment, it would have been necessary for him to have been present upon the execution, or have the mortgage forwarded to him for execution. Considering the antecedents of this couple, the latter course might have seemed difficult and the delegation to her of the closing of this transaction the easier and more practical way. Be that as it may, she carried on, taking title in her own name and giving the purchase-money mortgage. The transaction occurred on August 19, 1939, and *271 in September, when he was temporarily laid off, he returned to the family the very day they moved into the new home. He now claims that at that time he made a demand that the property be placed in his name and excuses or explains his failure to act on the information given him by his wife on the ground that they had no car and would let it ride for a time. He later testified that he did not remember, but would not swear whether his wife did, or did not, offer to sign a joint deed in April of 1940; that he had no objection to the title being in her until she “ by false representation and lies double crossed” him at the time he was put in jail in 1943; that “ I always meant for the property while I was away, I never dream of ever changing it until I come home. I thought there was plenty of time after I come home to change the property in my name.” This latter testimony is inconsistent with his present claim that he demanded the deed when they took over the home. Here is a man who had always kept a tight grip on the family purse strings, and it is easy to understand that he would want the property in his name. Yet, had that been his intention, one would think that, either in the two and a half months he spent at home in the Fall of 1939, or on one of his visits home, he could have found a way to go the short distance from Livonia Center to Livonia on a Friday when Mr. Bishop was available. Certainly the date of discharge of the mortgage would seem to have been a logical time to have terminated the trust and to have made the title conform to his intention. But human beings do not always follow the course of logic in the conduct of their affairs, and now he simply claims that from the very beginning he understood the title ultimately was to be in him, and delayed making the change until his return home, because he trusted his wife. But when he came back to Livonia Center in April of 1943 he was met by a warrant and thrown in jail on his wife’s complaint. Can it be said that his trustful attitude survived this, as he claims, unjust and unwarranted arrest and imprisonment. He answered this question when he said he did not object to the title being in her until she ‘ ‘ by false representation and lies double crossed” him. Almost immediately, following his release and on May 1, 1943, some kind of agreement was executed by Mr. and Mrs. Alonzo. Its purpose and terms are not before us, but we do know that from that time Mr. Alonzo did not live with his wife and children, and the very fact that an agreement was reduced to writing is eloquent confirmation of his shattered confidence and trust. He may explain his failure to assert right to title up to this point by reason of trust in his wife, but from the date of the imprisonment and agreement, *272 that reason was nonexistent. Yet he remained silent as to his claim to the property. Neither are the details of the proceedings in Children’s Court a part of this record, but we do know that it was not until he failed to meet certain obligations imposed upon him by order of that court and, according to the defendant was $670 in arrears, an amount approximating the purchase price of the home, that he sprang to action in the form of the present litigation. This belated assertion of title is tinged with revenge rather than the right of ownership.
When asked whether there was some talk between her and her husband in Pennsylvania as to who should have title in the property, at one moment Mrs. Alonzo testified, ‘ ‘ no, there was nothing said about that because he left it all for me to do, said for me to go out with the children and get the place and he would send as much as he could to pay on it and for me to work and support the children as much as I could and he would pay for the place as soon as he could. * * * Well, he said you go and get the place in New York somewhere, buy a place and he would send the money to me to pay for the place and I could attend to all the business and have it all, have everything put in my name, and he didn’t say when he wanted it put in his name or anything about it at that time.” (Italics mine.) Although according to this testimony he did not specify a time for transfer or speak about it then, the word “ when ” seems to point to a mutual understanding that a time would come when it would be placed in his name, and the plaintiff claims that this oral understanding was ratified by the defendant in one or more of the letters destroyed by her. This she denies, and is in a position so to do by her own ill-advised act of destruction. While we are deprived of any light the letters from his wife might have shed on the question of title, we do have Mr. Alonzo’s testimony that, in the conversation concerning the lawyer at the time they moved into the home when his wife told him his name was not in the deed and when he now claims he made a demand for the property, he said “ Well, we can go down and have it on.” (Italics mine.) To me this testimony is very significant. The true meaning of the witness is often obscured by the fact that both Mr. and Mrs. Alonzo at times lack facility and precision of expression. I recognize that the plaintiff now claims that from the beginning he understood and intended that the title should be in him, but a careful study of the record and his long-continued inertia create a grave doubt that his present position reflects his intention at the time the property was purchased. I cannot say from the evidence whether they contemplated a complete transfer from his wife to him or whether *273 they had in mind having his name included in the deed as the word “on” would seem to indicate. Mrs. Alonzo did not challenge the occasion for seeing Mr. Bishop, which evidences that there existed in her mind some reason to do so, and that reason could only have been some change in title, but we must remember she claims to have suggested and offered to have the property put in both their names in April, 1940. This the plaintiff would not deny, although he said he did not remember it. However, his statement that they could have his name on the deed is in line with her offer.
I am not overlooking the fact that he furnished the money for the purchase and improvement of this property, but here were a husband and wife who, with meagre funds, undertook to procure a home while maintaining a growing family of four children. He chose to devote himself primarily to paying for the property and its improvement, and secondarily to contributing toward the family support. His wife, with no less zeal and diligence, went to work and by her testimony showed substantial earnings, “ every cent ” of which she claims went for support of the family.
I have gone thus into detail in an effort to determine whether the plaintiff has met the burden resting upon him. In my opinion, untarnished truth does not rest with either litigant. That “ dominion that goes with ownership,” which was implied by the instructions and allocation of money by the plaintiff to be applied on the purchase, repairs and improvements of the home, was seriously weakened by the inconsistencies and contradictions of his own testimony and by his course of conduct through the years, especially after the break of 1943. The plaintiff has not satisfied me by a fair preponderance of the credible evidence that a constructive trust was intended or created.
The motion for a dismissal of the complaint is granted. Exception.
A dismissal of the complaint automatically disposes of the plaintiff’s claim for an accounting of the rents. Having reached the conclusion that the fee of this property rests in the wife absolutely, the question of rentals is of no legal concern to the plaintiff.
The motion made by the plaintiff at the opening of the case for a dismissal of the counterclaim, upon which decision was reserved, is denied. Exception. The counterclaim alleges arrears in the sum of $670, but this sum evidently embraces amounts claimed under the agreement of May 1, 1943, as well as under the Children’s Court order of May 24, 1944. Upon *274 objection being interposed to the competency of evidence supporting the allowance by the Children’s Court, counsel for the defendant proposed to limit his proof to the arrears before modification of the agreement by Children’s Court order, but no evidence on this subject was offered. While it is possible to compute the amount which accrued under the Children’s Court order of May 24, 1944, to the commencement of this action on July 28, 1944, and, by subtraction, arrive at the claimed arrearage under the agreement, there is insufficient evidence to allow me to properly weigh and pass on the latter, and I am of the opinion that failure to obey the order of the Children’s Court did not create a contract liability upon which the defendant could recover in this action. The only relief there available lies in the court from which the order issued. (Children’s Court Act, art. Ill-A, § 33-d.) Therefore, the defendant having failed to establish a cause of action upon his counterclaim, the same is dismissed.
Findings of fact and conclusions of law may be prepared and submitted in accordance with this decision.